DETERMINED IN THE

# SECOND DEPARTMENT

AT

# GENERAL TERM

## 𝕱𝖊𝖇𝖗𝖚𝖆𝖗𝖞, 1893.

---

## THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT, v. JOSEPH ROSENBERG, APPELLANT.

*Chapter 646 of Laws of 1892 prohibiting fat rendering, etc. — constitutionality of — scope of the police power of the State—due process of law in legislative proceedings.*

Chapter 646 of the Laws of 1892, which prohibits the business of fat rendering, bone boiling or the manufacture of fertilizers within the corporate limits of any incorporated city of the State, or within three miles therefrom, and makes an infraction thereof a misdemeanor (by its terms being inapplicable to certain counties of the State), is not within the inhibitions of the Federal and State Constitutions against the abridgment of the privileges or immunities of citizens, and the deprivation of liberty or property without due process of law, and the denial of the equal protection of the laws, but is valid as an exercise of the police power of the State, and will support an indictment and conviction for a misdemeanor.

In legislative proceedings due process of law requires no more than conformity to rules and methods of free government, and the omission to exercise powers inhibited by the Constitution, or delegated to the other great departments of government.

The police power of the State, when exercised in subordination to the Constitution, justifies all legislation pertaining to the health, comfort, safety and welfare of the public.

The business of fat rendering, i e., melting and clarifying animal fat, is noxious and *prima facie* a nuisance, and its prohibition falls within the scope of the police power of the State.

APPEAL by the defendant, Joseph Rosenberg, from a judgment of the Court of Sessions for the county of Kings, entered, on the 29th day of November, 1892, on a verdict convicting the defendant of a misdemeanor, upon an indictment for unlawfully carrying on the business of fat rendering within the corporate limits of an incorporated city of the State, namely, within the city of Brooklyn, in Kings county.

*A. Simis, Jr.*, for the appellant.

*James W. Ridgway*, district attorney, for the respondent.

BARNARD, P. J.:

The legislature, by chapter 646 of Laws of 1892, made it a misdemeanor for any person to carry on the business of fat rendering in any incorporated city in the State, with some counties excepted, but not the city of Brooklyn or Kings county. Before the passage of the act the defendant had carried on his business under a permit from the board of health, at least that fact must be assumed, as the defendant's evidence to prove it was excluded. The only question, therefore, is, whether the act in question is constitutional. The act is good. (*Cronin* v. *The People*, 82 N. Y., 318; *Metropolitan Board of Health* v. *Heister*, 37 id., 661.)

There is no conflict between these cases and the subsequent cases decided by the Court of Appeals. (*People* v. *Marx*, 99 N. Y., 377; *Matter of Jacobs*, 98 id., 98, and *People* v. *Gillson*, 109 id., 389.)

The Jacob's case was under an act prohibiting the manufacture of cigars and tobacco in tenement-houses. The Marx case was under an act which prohibited the sale of any article of food as a substitute of butter. The Gillson case came under chapter 691, Laws of 1887, which amended the Penal Code so that it was made a misdemeanor to sell an article of food with an understanding or promise that something else is to be given to the purchaser by way of reward. It is manifest that none of these cases conflict with preceding cases, which necessarily involve the question presented by the record. The legislature can determine that fat rendering in the city of Brooklyn is a nuisance, without the power of review by the courts.

The conviction and judgment should be affirmed.

PRATT, J., concurred.

DYKMAN, J.:

This is an appeal from a judgment of conviction in the Court of Sessions of Kings county.

The defendant was indicted, tried and convicted for a violation of chapter 646 of the Laws of 1892, entitled "An act ro prevent fat rendering, bone boiling or the manufacture of fertilizers within the corporate limits of any incorporated city of this State, or within a distance of three miles from the corporate limits thereof."

The statute is as follows:

Sec. 1. It shall not be lawful for any person or persons to engage in or carry on the business of fat rendering, bone boiling, or the manufacture of fertilizers or any business as a public nuisance within the corporate limits of any incorporated city of this State, or within a distance of three miles from the corporate limits of any incorporated city; provided, however, that nothing herein contained shall prevent the rendering of fresh killed cattle or swine.

Sec. 2. All departments of health, or the commissioner or commissioners thereof in any incorporated city of this State, shall have power to enforce the provisions of this act.

Sec. 3. Any person or persons offending against the provisions of this act shall, upon conviction thereof, be guilty of a misdemeanor. This act shall not apply to the counties of Fulton, Wayne, Tompkins, Chautauqua, Orange, Dutchess, Erie, Monroe, Oneida, Onondaga, New York, Schoharie, Ulster, Green, Cayuga, Cattaraugus, Niagara, Saratoga, Schenectady, Hamilton, Montgomery and Orleans.

Sec. 4. This act shall take effect immediately.

The indictment charged the defendant with carrying on the business of rendering the fat from animal matter, not from freshly slain cattle and swine.

The testimony upon the trial sustained the allegation in the indictment, and all testimony tending to show that no noxious odors arose from the process of rendering fat; that the defendant carried on the business under permission of the board of health of the city of Brooklyn; that he had erected buildings and put in boilers for the purposes of the business and invested capital therefor, and that the neighborhood where the business was conducted was sparsely populated was excluded by the court, and the defendant excepted to such exclusion.

The only question involved in this appeal is the constitutionality of the law under which the indictment was framed, and the defendant insists upon its unconstitutionality because it interferes with the enjoyment of his property and business without compensation, and that it is beyond the competence of the legislature to prohibit his business without evidence that it is a nuisance.

The constitutional provisions relied upon by the defendant are these: " No person shall be * * * deprived of life, liberty or property without due process of law." " No member of this State shall be * * * deprived of any of the rights or privileges secured to any citizen thereof." (Section 6 of article 1 and section 1 of article 1 of the State Constitution.) " No State shall make or enforce any law which will abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." (United States Constitution, fourteenth amendment.)

The term liberty, as it is here employed, implies much more than personal unrestraint. It has been said many times of late, in learned and exhaustive opinions in our highest appellate tribunal, that it includes freedom in the use of the faculties with which the God of Nature has endowed mankind, freedom in the acquisition and use of property, and freedom to follow a lawful avocation. The rigidity with which the rights of the citizen will be protected from the effects of unauthorized legislation is exemplified in several recent decisions to which allusion may be made here.

In the case of *Jacobs* (98 N. Y., 98) a statute had been enacted which prohibited the manufacture of cigars or preparation of tobacco in any form on any floor in a tenement house, if such floor was occupied as a residence. The title of the act was, " An act to improve the public health by prohibiting the manufacture of cigars and preparation of tobacco in any form in tenement houses in certain cases," etc., and the Court of Appeals held it to be unconstitutional.

In the case of *Marx* (99 N. Y., 377), the title of the act brought in question was, " An act to prevent deception in sales of dairy products," and section 6 of the act declared, among other things, that no person should manufacture out of any oleaginous substances or any compound of the same other than that produced from unadul-

terated milk or cream from the same, any article designed to take the place of butter or cheese produced from pure unadulterated milk or cream of the same, or should sell or offer to sell the same as an article of food. And then there was a proviso that the section should not apply to pure skim milk, cheese produced from pure skim milk. That law was also held to be unconstitutional.

In *Gillson's Case* (109 N. Y., 389) the statute was designed to amend the Penal Code by prohibiting the sale of any article of food upon any representation that anything else would be delivered as a gift or reward to the purchaser, and it was held to be unconstitutional and void. These three cases and some others of the same class are relied upon by the defendant to sustain his attack upon the law under which he was indicted.

It is undeniable that the statute in question impairs the value of the defendant's property by imposing restrictions upon its use, and thus depriving it of one of its essential attributes, and also abridges his own freedom of action in respect thereto.

It does not follow, however, that because a statute regulates the use of property or abridges freedom of action in relation to the same, it is, therefore, unconstitutional, or a deprivation of property in the constitutional sense.

Neither individual rights nor the right to property are absolute, and both may be diminished for the welfare of the public without encroachment upon constitutional rights.

In fact, such limitation is implied in all of the constitutional provisions quoted, and although the language employed is negative and prohibitive, it yet contains an implication that such deprivation may be wrought by such due process of law. It is simply the converse of the implication which confers the immunity so essential to freedom.

In legislative proceedings due process of law requires no more than conformity to rules and methods of free governments, and the omission to exercise powers inhibited by the Constitution or delegated to the other great departments of government.

There is ever a condition annexed to the ownership of property that its use shall not be injurious or detrimental to the public, and that principle is but the outgrowth and enlargement of the maxim "*sic utere tuo ut alienum non laedas,*" a fundamental maxim of unlimited obligation as old as civilization, which contains an ethical

principle of universal applicability, and which lies at the foundation of what is known as the police power of the State. A power which pertains to sovereignty and is frequently exerted to enforce the observance of the maxim, and is, therefore, co-extensive with the obligation it imposes. Its sphere of operation is wide and it is far reaching in its legitimate scope. It need not be accurately defined or circumscribed, but when it is exerted in subordination to the Constitution, it justifies all legislation pertaining to the health, comfort, safety and welfare of the public. It often justifies the total destruction of property and the removal of everything dangerous to health.

The power is often exerted to prohibit the use of property for any business in densely populated communities which raises baneful and insalubrious exhalations injurious to health and dangerous to life. But these cases do not bound its sphere of operation. In the case of the *People* v. *King* (110 N. Y., 418) it was permitted a much wider range. It was there decided that the owner of a skating rink subjected it to public regulation so long as he devoted it to purposes of public entertainment.

The full scope and extent of the power was recognized in the three cases first above mentioned and in all kindred cases, but it was held that the statutes under consideration in those cases did not fall within its operation.

In speaking of the power in the *Jacobs Case (supra)*, Judge EARL said: "Under it the conduct of an individual and the use of property may be regulated so as to interfere to some extent with the freedom of the one and the enjoyment of the other."   *   *   *

Judge COOLEY says: "The regulation must have reference to the comfort, safety and welfare of society." (Const. Lim., 719.) And as that seems to be in harmony with both principle and authority, we will now turn to the act under consideration and ascertain where it must be placed.

In this country many elements enter into the consideration of every question of constitutional law. We live under two governments, the State and the national. Each of these has its constitution to which all owe obedience, and each has its peculiar sphere of action. The powers of the national government are definite and

restricted, and those of the State government are general and residuary.

All legislative power of this State is vested in the senate and assembly, and that power comprehends every subject which belongs to the legislative department of government, subject to the limitations imposed by the Constitution of the State or of the United States.

By reason of the generality of the legislative power in the State legislature the presumption is in favor of the constitutionality of legislative acts. Starting, therefore, with the presumption in favor of the validity of this statute, we must determine whether it is violative of any constitutional limitations or restraints.

The statute renders it unlawful for any·person to carry on the business of fat rendering, and some other business of the same character within the limits of any incorporated city in this State, or within three miles from the limits thereof. Certain counties are exempted from its operation, but Kings county is not so excluded.

The indictment against the defendant is for fat rendering, that is, for melting and clarifying animal fat, and that business has ever been classed with bone boiling, slaughter-houses, soap boiling and the like as noxious and, *prima facie*, a nuisance. (*Dubois* v. *Budlong*, 15 Abb. Pr., 446; *Catlin* v. *Valentine*, 9 Paige, 575; *Brady* v. *Weeks*, 3 Barb., 157 *Peck* v. *Elder*, 3 Sandf. Sup. Ct., 129.)

Such uses of property are, *prima facie*, a nuisance, because experience has demonstrated their productivity of ill results. Offensive odors are liberated in the process of melting the tallow, and the fumes and stenches arising therefrom impregnate the air and render it impure, uncomfortable and unwholesome.

It was decided in the case of *Peck* v. *Elder* (3 Sandf., 126), that a fat-melting house in a city, for the purpose of trying animal fat from the slaughter-houses, was presumptively a nuisance to the inhabitants of the city. Such being the character of the business prohibited by this statute, it falls easily within the scope of the police power of the State. The preservation of the public health has ever been a primary object of the legislature, boards of health are organized for that purpose in the towns, cities and villages of this State, and the power to make by-laws and ordinances to secure sanity and health has been delegated by the legislature to municipal

corporations. All health laws and the quarantine laws are also based upon the same power, and the right to make all necessary laws for the preservation of the public health has been exercised since the formation of the State government and cannot now be successfully questioned.

At the first session of the legislature a law was passed on the 4th day of April, 1778, to prevent the spreading of small-pox, by which the justices of the peace were authorized to appoint houses wher persons infected with the small-pox might reside, and provided fo. the forcible removal of such persons to such houses.

On the 13th day of April, 1784, the legislature of the State passed an act making it unlawful for any person to keep more than twenty-eight pounds of gunpowder in any one place, less than one mile to the northward of the city hall in New York city, except at the public magazine, at the Fresh Water, meaning the old Collect pond.

The first quarantine law in the State was passed May 4, 1784, soon after the close of the Revolutionary War, and was entitled an act to prevent the bringing in and spreading of infectious distempers in this State. It provided that all vessels having on board any person infected with any contagious distemper or coming from any place infected with such contagious disease should not come into any port in this State and should not come nearer to New York than Bedloe's island, and should be obliged to perform quarantine under certain specified regulations.

That kind of legislation has remained unchallenged and has been continued with augmented severity so that now the largest vessels are arrested and searched, the liberty of the passengers restrained and the infected cargo cast into the sea. The same power which justifies the destruction of property and the removal of everything dangerous to health and subordinates private interests to the welfare of the public is sufficiently cogent and coercive to justify a law which prohibits the use of private property in a large city for a purpose which is noxious and injurious to the health of the community.

It is the sovereign power of the State committed to the legislature for the safety of the community to be exerted for the production of the end by adequate means, not violative of constitutional limitations. It was within the province of the legislature to determine that the exigency existed in the cities of this State for the exercise of the

power, and we conclude that the business conducted by the defendant was a proper subject for its exercise.

The law was enacted and designed to promote and protect the public health, and it was appropriate to the accomplishment of that end.   It does not, therefore, infringe upon the liberty guaranteed to all to adopt any lawful pursuit not injurious to the community, because we have seen this particular business is so injurious.   That the statute is new or more stringent than former laws is no argument against its validity.   Judge ANDREWS, in the opinion in *Lawton* v. *Steele* (119 N. Y., 233), said : " But we know of no limitation of legislative power which precludes the legislature from enlarging the category of public nuisances or from declaring places or property used to the detriment of public interests or to the injury of the health, morals or welfare of the community, public nuisances although not such at common law."

Statutes regulating trade and controlling the use of private property in the public interest have been upheld in recent years in this State, and in the Supreme Court of the United States.

In 1883, the legislature of this State passed a law declaring any fish net found in any of the waters of the State, in violation of existing laws for the preservation of fish, to be a nuisance, and authorizing their destruction, and that act was held to be a valid exercise of the legislative power.   (*Lawton* v *Steele*, 119 N.Y., 226.)

Section 383 of the Penal Code, declaring that no citizen can be excluded from places of amusement by reason of race or color, was held to be a valid exercise of the police power of this State over a subject within the cognizance of the legislature.   (*People* v. *King*, 110 N. Y., 418.)

The act fixing the maximum charge for elevating grain was held to be a legitimate exercise of the police power of the State over a business affected with a public interest.   (*People* v. *Budd.*, 117 N. Y., 1 ; *People ex rel. Annan* v. *Walsh*, id., 621.)   This last case involved the same question as Budd case, and was subsequently affirmed by the Supreme Court of the United States.

The case of *Munn* v. *Illinois* (94 U. S. [4 Otto], 113), has become a leading case, and it holds the same doctrine.

In the case of *Bertholf* v. *O'Reilly* (74 N. Y., 509) the Court of Appeals decided that the legislature had power to create a cause

of action for damages in favor of a person injured, in person or property, by the act of an intoxicated person against the owner of real property, whose only connection with the injury was that he leased the premises with knowledge that intoxicating liquors were to be sold thereon.

The operation of that statute certainly was to restrain the freedom of the owner in the use of his property and so impair its value, and so far was parallel with this, and yet it received the sanction of our highest court.

We are, therefore, led to the conclusion that the statute under consideration is a valid exercise of legislative power, and that the conviction should be affirmed.

PRATT, J., concurred.

Conviction and judgment thereon affirmed.